IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CIVIL NO. _____ |
| | * | |
| $34,092.01 IN U.S. CURRENCY, and | * | |
| | * | |
| Defendant | * | |
| | * | |
| ****** | | |

## DECLARATION OF BRENDAN GRACE

I, Brendan Grace, Special Agent with the Drug Enforcement Administration ("DEA") do hereby declare:

### Introduction and Agent Background

1. I am employed as a Special Agent with the DEA and have been so employed since May 2020. I am currently assigned to the High Intensity Drug Trafficking Area ("HIDTA") Group 51 of DEA's Baltimore District Office.

2. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7)—that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

3. As part of my employment with DEA, I attended the Basic Agent Training Program, a resident program that included academic instruction in the basics of report writing, law, firearms, surveillance techniques, interview and interrogation techniques, automated information systems, drug identification, defensive tactics, as well as leadership and ethics.

4. Prior to joining the DEA, I was a Military Police Officer in the Active Duty Army for over four years. As a result of my law enforcement experience, I have had the opportunity to work with other experienced law enforcement officers.

5. I have a Bachelor's Degree in Political Science Pre-Law. I have participated in the execution of search and seizure warrants yielding drugs, currency, and firearms.

6. Through my training, education, experience, and the experience of those with whom I work, I have become familiar with street sales of illicit drugs; the use of "stashes" and "stash houses"; the prices, quantities, and packaging of illicit drugs; the use of couriers in the distribution of illicit drugs; drug traffickers' methods and modes of communication and the counter-surveillance techniques they employ; drug traffickers' language, terminology, traits, actions, and codes; the manufacturing and processing of controlled dangerous substances ("CDS"); and methods of asset concealment utilized by dealers of illicit drugs. Based on my training and experience, I know that narcotics dealers often use multiple cellular telephones for the purpose of communicating with sources of supply as well as communicating with customers.

7. I have participated in the execution of numerous search and seizure warrants yielding large amounts of CDS and leading to the arrests of numerous persons for violations of the CDS laws. In addition, through my investigative experience, I know that persons involved in the illegal distribution of CDS keep and maintain records of their various unlawful activities. My experience in similar cases has established that such records are regularly concealed in suspects' automobiles, residences, offices, and on their persons, or in warehouses and storage lockers. And these records also take various forms—including both physical and electronic. Records commonly concealed by traffickers include, but are not limited to, notes in code, deposit slips, wired money transactions, savings pass books, hidden bank accounts, photographs of CDS

and co-conspirators, various forms of commercial paper, personal address books, notebooks, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) for both commercial and private travel, money orders and other papers relating to the ordering, transportation, sale, and distribution of CDS, and other documents that identify co-conspirators. The aforementioned records are usually kept in locations that are considered safe by drug traffickers—including in residences, vehicles, and on their persons—and where they have ready access to them.

## Purpose of This Declaration

8. This declaration is submitted in support of a complaint for forfeiture *in rem* of $34,092.01 U.S. Currency ("USC") seized from 1211 S. Eaton Street, Apt. 2069, Baltimore, Maryland on September 1, 2021 (21-DEA-682531) (the "Subject Currency").

9. I submit that there are sufficient facts to support a reasonable belief that the Subject Currency constitutes (1) moneys furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act; (2) proceeds traceable to such an exchange; or (3) moneys used or intended to be used to facilitate a violation of the Controlled Substances Act in violation of 21 U.S.C. § 841 and thus is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

## Summary of the Investigation

10. During July 2020, DEA HIDTA Group 51 began to investigate Gerrod DAVIS and his organization, which operates in the Baltimore Metropolitan area. In July 2020, investigators received information from DEA Agents in another district regarding an individual in the Baltimore area who was seeking to arrange a pick-up of U.S. currency on behalf of a large-scale international Drug Trafficking Organization (DTO). According to the information, the

money represented narcotics proceeds and was expected to be deposited in a bank account, and then transferred into another bank account, before being sent to its final destination. This individual was identified as Gerrod DAVIS.   Investigators have picked up various sums of money from DAVIS between July 20, 2020, and May 6, 2021, which totaled approximately $1.8 million.  Each time investigators received or seized U.S. currency from DAVIS, the currency was rubber-banded and included small denominations of money.  Based on my training, knowledge, the packaging of the currency was consistent with the packaging of narcotics proceeds.

11. On September 15, 2021, DAVIS a federal grand jury in the District of Maryland returned an indictment charging DAVIS with conspiracy to distribute and possess with intent to distribute narcotics in violation of 21 U.S.C. § 846.  *See United States v. Gerrod Davis et al.*, 21-cr-361-LKG (D. Md.).  At the time of this Declaration, DAVIS's federal criminal case is still pending trial.  Investigators also know that DAVIS has multiple arrests stemming from CDS investigations in the Baltimore area, as well as information from a past investigation from HSI as noted above.  DAVIS has CDS-related convictions from 1997, 1999, 2001 and 2002.

12. DAVIS is believed to be responsible for distributing cocaine, heroin and potentially other narcotics to his organizational members.  A portion of the money he and his organization make from the sale of narcotics is laundered back to a Mexico-based cartel through the money pickups.  Additionally, investigators have identified numerous associates of DAVIS, which include Marcel HALL (hereinafter referred to as M. HALL), Tracey MOODY, Cervantez PEARSON, Keon CHAVEZ, Theodore HALL (hereinafter referred to as T. HALL) and FISHER.

13. Investigators have identified 1211 S. Eaton Street, Apartment 2069, Baltimore, Maryland (the "EATON PREMISES") as the home of Tracey MOODY and a suspected stash house operated by MOODY. MOODY is believed to be a retail narcotics dealer and an associate of DAVIS. A Department of Justice Administrative subpoena was served to the property manager of the Alta Brewers Apartment complex (EATON PREMISES) and the results found that Tracey MOODY is the current renter of the EATON PREMISES. Investigators have observed MOODY using her access card to park inside the EATON PREMISES parking garage, getting out of her vehicle, a yellow Lexus bearing Maryland license plate 9EF8982, and using a key to enter into the second floor of the EATON PREMISES and using her key to enter apartment 2069. Investigators also observed MOODY meeting with an individual after she left the EATON PREMISES and conducted a narcotics transaction, where suspected heroin and suspected cocaine were seized from this individual.

14. On June 4, 2021, at approximately 3:00 p.m., investigators conducted surveillance in the vicinity of the EATON PREMISES. At approximately 3:17 p.m., an investigator observed the MOODY's yellow Lexus with Maryland registration 9EF8982 drive into the parking lot and park in front of the main office at the EATON PREMISES. The investigator observed MOODY get out of the yellow Lexus and walk into the main lobby entrance. At approximately 7:03 p.m., the investigator observed MOODY walk out the main lobby and get into the Lexus. MOODY drove to a nearby store before returning driving into the parking garage at the EATON PREMISES. An investigator parked in the garage observed MOODY get out of the Lexus and walk into the EATON PREMISES on the second floor entrance.

15. On June 7, 2021, investigators set up surveillance to observe MOODY and her activity at the EATON PREMISES. At approximately 12:44 p.m., an investigator observed

MOODY get into her Lexus and drive away from her parking space and to a lower-level parking space.  At approximately 1:31 p.m., the investigator observed MOODY carrying a black duffle bag in her left hand and get into the Lexus and drive out of the garage.  Investigators followed MOODY to the Safeway parking lot, located at 2610 Boston Street, Baltimore, MD.  An investigator observed a white male get into the front passenger door of the Lexus.  At approximately 1:57 p.m., an investigator observed a Hyundai with Delaware license plates parked in front of the Lexus.  The unknown white male met briefly with MOODY in the yellow LEXUS before returning to the Hyundai. A Delaware Department of Motor Vehicle inquiry was conducted for Delaware registration 295163.  The results revealed this vehicle is registered to Timothy Brian LESSNER, and investigators positively identified the white male as LESSNER.  Surveillance followed the Hyundai to 701 Gregwood Court, Dundalk, MD, when the occupants got out of the vehicle and entered the home.  Investigators believe that MOODY retrieved a quantity of narcotics from the EATON PREMISES and used the Yellow Lexus to transport the narcotics to meet with LESSNER.  Investigators know, based on training, knowledge and experience, that narcotics dealers travel short distances from their homes to conduct narcotics transactions because it limits their exposure to law enforcement surveillance.

16.	At approximately 2:57 p.m., investigators went back to the EATON PREMISES to set up surveillance to observe MOODY.  Investigators observed TARGET VEHICLE 5 parked in front of the leasing office at the EATON PREMISES.  Investigators were monitoring the tracker on DAVIS's vehicle, a Grey Honda Odyssey van, bearing Maryland registration 9EF1602, which drove into the parking lot and parked along the south side of the EATON PREMISES.  An investigator observed DAVIS's van drive and park in front of the apartment building, several spaces away from MOODY's Lexus.  An investigator observed DAVIS get out

6

of his van with a medium size, weighted black shopping bag and walk to the front entrance where he was met by MOODY.  DAVIS and MOODY walked into the front door of the apartment building.  Approximately an hour later an investigator observed DAVIS and MOODY walk out of the EATON PREMISES. The investigator observed DAVIS was still carrying the bag he went in with.  Investigators observed MOODY and DAVIS get into their respective vehicles as DAVIS got back into his van with the bag and left the area.  Investigators believe based on training, knowledge, and experience that narcotics dealers use other persons to transport narcotics to a certain location for the purpose of selling the narcotics to a third party. Investigators believe that DAVIS met with MOODY inside the EATON PREMISES to complete a narcotics transaction in exchange for U.S. currency.

   17. On June 8, 2021, at approximately 10:30 p.m., investigators set up surveillance near the EATON PREMISES to observe the movement of MOODY.  At approximately 1:59 p.m., investigators staged in the parking garage at MOODY's apartment building observed MOODY walk out of the 2nd floor hallway and get into the yellow Lexus.  Surveillance units followed MOODY to the parking lot of the Harris Teeter supermarket, located at 3779 Boston Street, Baltimore, MD.  Investigators observed MOODY get out of the Lexus and then get into the passenger side of a Hyundai operated by Timothy LESSNER.  MOODY was inside the passenger side for a few minutes before getting out and getting back into TARGET VEHICLE 5 and driving off.  Investigators followed LESSNER to the parking lot of the Five Guys restaurant, 3600 Boston Street, Baltimore, MD 21224, which is near the EATON PREMISES. Investigators noticed that MOODY had arrived on the parking lot, as she drove from the area of the EATON PREMISES. Investigators observed MOODY meet with LESSNER. After this meeting LESSNER and MOODY parted ways and investigators followed LESSNER.

18. Investigators followed LESSNER onto I-95 south. Investigators coordinated with MDTAP to conduct a traffic stop on the Hyundai. MDTAP conducted a stop on LESSNER for exceeding the speed limit. In the normal course of the traffic stop, LESSNER opened the center console, and the officer observed a bag of a white powdery substance, which he suspected was cocaine, in plain view. The officer asked LESSNER about it and LESSNER said "it is what you think it is, sir." The officer conducted a probable cause search of LESSNER's vehicle and seized 2 small, tied off, clear wrapping bags with white substance (suspected cocaine), and 1 small, tied off, clear wrapping bag with a brown substance (suspected heroin). The officer asked LESSNER about the CDS and LESSNER admitted that he purchased it for a friend of his. The officer seized the drugs on scene. LESSNER was not arrested and was released on scene. Investigators met with the officers and took possession of the suspected cocaine and heroin. Investigators submitted the suspected narcotics to the Mid-Atlantic laboratory for analysis and safekeeping. Portions of the substances were later analyzed by the Mid-Atlantic laboratory, and the laboratory results found that the brown powdery substance was heroin, and the white powdery substance was cocaine. Based on my training and experience, and LESSNER's statement, investigators believe that MOODY supplied LESSNER with the heroin and cocaine. Based on these observations, investigators believe that MOODY retrieved the narcotics from the EATON PREMISES and then supplied the narcotics to LESSNER. Furthermore, investigators believe, based on training, knowledge and experience, that MOODY received amounts of narcotics from DAVIS and that the narcotics seized from LESSNER were given to MOODY during the meeting with DAVIS, on June 7, 2021, inside the EATON PREMISES.

19. On August 19, 2021, the Honorable Thomas M. DiGirolamo, U.S. Magistrate Judge for the District of Maryland, signed search warrants for the EATON PREMISES,

MOODY's Lexus, and several locations and vehicles connected with DAVIS and his associates. On September 1, 2022, DEA investigators executed the search warrant on the EATON PREMISES. MOODY was the only person in the residence and was found in the left bedroom. Investigators seized seven phones and $34,092.01 U.S. currency from the apartment. The majority of the U.S. Currency was found in a water jug next to the bed in the room MOODY was found. I know from training, knowledge and experience that it is common for drug dealers to keep a large amount of U.S. Currency around the house and use multiple phones to conduct drug related business. Based on the totality of the investigation, I and other investigators believe that the bulk currency constitutes proceeds of narcotics trafficking.

### A. *Wage and Employment Records*

20. In August 2021, a check for wages in Maryland was conducted for MOODY. The wage check revealed that MOODY earned a total of $5,221.00 in reported wages for the first two quarters of 2021 from Marine Terminals Corporation, and a total of $18,039.05 in reported wages for the entire year in 2020. MOODY's income makes it unlikely that the $34,092.01 in U.S. Currency was the accumulation of savings from lawful employment.

### B. *Criminal History of Narcotics Offenses*

21. Tracey MOODY was convicted in 1998 for possession with intent to distribute narcotics and sentenced to 10 years imprisonment with 9 years, 11 months and 29 days suspended. She was also convicted in 1993 for possession with intent to distribute narcotics and sentenced to five years imprisonment with all five years suspended.

### Conclusion

22. The evidence in this declaration provides probable cause to believe, and I do believe that the $34,092.01 U.S. Currency seized from 1211 S. Eaton Street, Apartment 2069,

Baltimore, Maryland in 2021 constitutes (1) moneys furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act; (2) proceeds traceable to such an exchange; or (3) moneys used or intended to be used to facilitate a violation of the Controlled Substances Act in violation of 21 U.S.C. § 841 in violation of 21 U.S.C. § 841(a)(1) and is forfeitable to the United States under 21 U.S.C. § 881(a)(6).

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 22nd day of April 2022.

_____
Brendan Grace
Special Agent
Drug Enforcement Administration